IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| K-7 ENTERPRISES, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Case No. 4:06-CV-57 |
| | § | |
| TOM D. JESTER, JR., | § | |
| PAUL M. HAYWOOD, | § | |
| P.J.'S CONVENIENCE STORES, INC., | § | |
| JESWOOD OIL COMPANY, and | § | |
| DEMAB CORPORATION, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION & ORDER DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The following motions are before the court:

1.   Defendants' Motion for Summary Judgment (de #76);

2.   K-7 Enterprises, L.P.'s Response to Defendants' Motion for Summary Judgment (de # 84);

3.   Objection and Reply to, and Motion to Strike Plaintiff's Response to Defendants' Motion for Summary Judgment (de #86);

4.   Defendants' Objections to, and Motion to Strike, Plaintiff's Response to Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran (de #89)

5.   Defendants Tom D. Jester, Jr.'s and Paul M. Haywood, Jr.'s Objections to, and Motion to Strike, Plaintiff's Response to Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran (de #90);

6.   Plaintiff's Sur-Response to Defendants' Motion for Summary Judgment (de #92);

7.   Plaintiff's Response to Defendants' Objections to, and Motion to Strike, Plaintiff's Response to Defendants' Motion for Summary Judgment and the Affidavits of Dan

Airey and Sullivan Curran (de #93); and

8.      Plaintiff's Response to Defendants Tom D. Jester, Jr.'s and Paul M. Haywood, Jr.'s Objections to, and Motion to Strike, Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran (de #96).

## I. MOTIONS TO STRIKE

Although two motions to strike have been filed, the two motions and the responses to them are virtually identical, and therefore, the court will address them as one and rule on them simultaneously. The Defendants first move to strike K-7's Response as untimely. As the court has already entered an order granting K-7's motion to enlarge time for responding to the Defendants' motion for summary judgment (docket entry #97), the Defendants' motion to strike K-7's Response is denied as moot.

The Defendants also move to strike the affidavits of Dan Airey ("Airey") and Sullivan Curran ("Curran"), or in the alternative, move to strike certain paragraphs of their respective affidavits. Defendants argue that Airey's affidavit relies upon undisclosed opinions and that K-7 knew of these opinions and failed to disclose them. K-7 responds that all of the information in Airey's affidavit was disclosed in Airey's report. Defendants next contend that both Airey and Curran are not qualified to testify as to whether a condition presents an imminent and substantial danger to human health. K-7 responds by noting that Defendants did not provide any authority to support their contention and by attaching the experts' resumes. Finally, the Defendants argue that Airey's and Curran's affidavits are not proper summary judgment evidence and that Airey's affidavit contradicts his prior testimony without explanation.[1] K-7 refutes these points.

When examining a summary judgment affidavit, the court should only disregard those

---

[1]  As stated, the Defendants also make several specific objections to each affidavit.

portions of the affidavit that are inadmissible. *Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992). The affidavit must set forth facts that would be admissible in evidence at trial. Fed. R. Civ. P. 56(e). In other words, evidence that would be inadmissible at trial cannot be used to avoid summary judgment. *Salas*, 980 F.2d at 305. Additionally, conclusory allegations may not be used  in a summary judgment affidavit. *Id.* An expert affidavit satisfies Federal Rule of Civil Procedure 56(e), even if the corresponding data is not attached, as long as the affidavit sets forth the facts upon which the expert relies. *Blansett v. Continental Airlines, Inc.*, 246 F. Supp. 2d 596, 601 (S.D. Tex. 2002).

Generally, any questions relating to the basis or source of an expert's opinion affect the weight a factfinder should give the opinion rather than the opinion's admissibility. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Therefore, such questions should be left for the factfinder. *Id.* When testimony would not actually assist the factfinder in reaching an intelligent and sound decision, however, then that opinion is inadmissible. *See id.*

As to the Defendants' first argument, the Plaintiff, K-7, has presented evidence showing that Airey did not rely upon undisclosed opinions. Also, the court considered the Defendants' claim that Airey's affidavit contradicts his prior testimony. The court has compared the earlier testimony with the affidavit statements and finds that the two are not directly contradictory.

As to the Defendants' second argument, the Defendants have not put forth any authority to suggest that Airey and Curran are not qualified to draw certain conclusions. Rather, the Defendants have only stated that because of their professions, Airey and Curran are not qualified. Such reasoning is not sufficient to strike the affidavits or deem these experts unqualified.

Finally, with regard to the allegations that the experts' affidavits are improper summary judgment evidence because they fail to state the reasoning upon which their opinions are based and

contain conclusory allegations and with regard to the specific objections to certain paragraphs of the affidavits, the court will rely upon the above-discussed case law regarding summary judgment affidavits and will consider the summary judgment evidence that it deems proper.  Accordingly, the Defendants' Objections to, and Motion to Strike, Plaintiff's Response to Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran (de #89) and Defendants Tom D. Jester, Jr.'s and Paul M. Haywood, Jr.'s Objections to, and Motion to Strike, Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran (de #90) are denied.

## II.  BACKGROUND

K-7 Enterprises, Inc. ("K-7") owns property located in Denton County at Lot 1, Block 1, Loop Centre, Denton, Texas (the "K-7 Property").  Tom D. Jester, Jr., Paul M. Haywood, P.J.'s Convenience Stores, Inc., Jeswood Oil Company, and Demab Corporation (collectively, the "Defendants") are current or former owners, operators or entities in control of underground petroleum storage tanks and related systems on a nearby property ("PJ's Property").

A.    *History of the Property and the Underground Storage Tanks*

A brief history of the properties and underground storage tanks ("USTs") at issue follows.[2] Defendants Jester and Haywood purchased PJ's Property from Don Johnson Oil Company in 1987 and remodeled it upon purchase.  At the time of the purchase, the existing USTs were removed and replaced with upgraded USTs.  The USTs provided gasoline for PJ's Convenience Stores, Inc. ("PJ's") and also for Carlton's 66 Service Station, an adjacent property with three gasoline

---

[2]  This factual history was taken from the undisputed facts found in Defendants' Motion for Summary Judgment unless otherwise noted.

dispensers.  Defendant Jeswood Oil Company ("Jeswood") delivered the gasoline for the USTs on

PJ's Property.  Defendant Demab ("Demab") purchased PJ's and PJ's Property on June 1, 2001.

Both the K-7 Property and PJ's Property are contaminated with petroleum constituents.  This lawsuit

arises out of the contamination.

In its Complaint, K-7 alleges that "petroleum based solid waste" ("Solid Waste") is leaking

from the USTs on PJ's Property and that the Solid Waste has contaminated the soil and groundwater

at the K-7 Property.  Compl. ¶¶ 10-11.  K-7 contends that this release of Solid Waste constitutes an

"imminent and substantial threat" to public health and the environment, which will continue until

all of the Solid Waste has been removed from the K-7 Property.  *Id.* at ¶ 12.  In its Complaint, K-7

stated that it sent notice to the Defendants 90 days prior to filing suit informing the Defendants that

they might be liable under the citizen suit provisions of the Resource Conservation and Recovery

Act ("RCRA") for the contamination.  *Id.* at ¶ 13.  K-7 then brought the instant suit against the

Defendants, requesting an order enjoining Defendants from "dispensing or storing petroleum

products at the [PJ's Property] ... until the leakage of petroleum and migration of Solid Waste

therefrom" stops and "requiring Defendants to commence and complete all necessary removal and

remedial actions" to restore the K-7 Property.

B.      *Procedural History*

The Texas Commission on Environmental Quality ("TCEQ")[3] was informed of a subsurface

contamination problem at the Defendants' facility in March 1998.  Response to Motion, Ex. R.  An

investigation was conducted, and it was determined that the benzene, ethylbenzene, and toluene

---

[3]  The predecessor to the TCEQ was the Texas Natural Resource Conservation Commission ("TNRCC"), and to the extent that this court refers to the TCEQ when the TNRCC was in operation, it is referring to the TNRCC.

concentrations in the soil and the benzene and toluene concentrations in the groundwater all exceeded the concentration levels allowed by the state. *Id.*, Ex. S.  The TCEQ found contamination on the K-7 Property in addition to PJ's Property.  Motion, p.14 (Uncontested Fact).  The TCEQ has overseen and at least partially funded the numerous soil samples and monitoring wells on both properties.  *Id.* at p. 15.  The affected groundwater zone is not used by anyone in the vicinity as the City of Denton provides water to those in the area.  *Id.*

On July 16, 2003, before filing the federal RCRA action, K-7 filed a lawsuit in the 158th Judicial District Court of Denton County, Texas (the "Denton case") against the same Defendants in the instant case[4] alleging negligence, gross negligence, trespass, nuisance, negligence *per se*, fraudulent concealment and seeking a declaratory judgment and monetary damages.[5]  K-7 also filed a lawsuit against the TCEQ in the 201st Judicial District Court of Travis County, Texas (the "TCEQ case") on January 21, 2005, asking the court to declare that the TCEQ violated Title 30 Texas Administrative Code section 334.81 by failing to require the Defendants to design and implement a Corrective Action Plan.  Def. Mot. for Summ. J., Ex. P.   The TCEQ case remains pending.

C.     *Statutory Framework*

K-7 brought this suit under the citizen suit provision of RCRA.  RCRA is a comprehensive environmental statute which provides for, in part, federal regulation of USTs.  *See* 42 U.S.C. §§ 6991-6991i.  The Environmental Protection Agency ("EPA") has promulgated regulations for USTs, but a state UST program with "primary enforcement responsibility" can operate in lieu of the federal

---

[4]  There were other Defendants in the Denton case who are not parties in the instant case.

[5]  The state court granted a motion for summary judgment on all claims as to Jeswood Oil Company, Tom D. Jester, Jr., Paul M. Haywood, P.J.'s Convenience Stores, Inc. and Demab Corporation (all Defendants in the instant case), as well as other defendants in the Denton case who are not parties in the instant case.

program if the EPA Administrator formally approves the state program.  42 U.S.C. § 6991c(d)(2).

The EPA approved the State of Texas to administer and enforce a UST program under RCRA in

1995, and the TNRCC (now the TCEQ) had previously been designated by the State of Texas as the

state agency for UST regulation.  40 C.F.R. § 282.93(a). 30 Tex. Admin. Code § 334.14(a)(1).  The

Texas Legislature stated several findings that detail the importance of the state's interest in

protecting groundwater, including maintaining usable groundwater and protecting the environment,

the public health and welfare, and the state's economy.  Tex. Water Code §§ 26.401(a)(1),(2),(4).

Under Texas's regulatory scheme, any UST must be properly registered with the TCEQ and

rules have been promulgated for corrective action for any registered UST that is found to be leaking.

Once a leak or contamination is discovered, the TCEQ responds with a corrective action plan

("CAP"), which the TCEQ will implement, assuming it will adequately protect the health and safety

of the public.  *See* Tex. Water Code § 26.351.  Any person affected by a TCEQ action, including a

CAP, may file a petition to review, set aside, modify or suspend the action in a state district court

in Travis County.  *Id.* at §§ 5.351, 5.354.  Any judgment in the Travis County district court may be

appealed just as any other civil case in which the district court has original jurisdiction.  *Id.* at §

5.355.  The TCEQ pays for a large part of the clean-up costs at the contaminated sites and further,

if a site qualifies for placement in the State Lead Program, the TCEQ will cover all costs of clean-up

unless the statutory guidelines provide otherwise.  *Id.* at § 26.3512.  According to the Defendants,

the properties at issue in the instant case qualify for the State Lead Program after August 31, 2007.

Def. Mot. for Summ. J., p. 11.  Therefore, it is likely that the State of Texas, rather than the

Defendants, will have responsibility for cleaning up the properties after that date.  Tex. Water Code

§ 26.3573.

### III.   LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually insufficient claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law identifies which facts are material.  *See id.*  The party moving for summary judgment has the burden to show that there is no genuine issue of fact and that it is entitled to judgment as a matter of law.  *See id.* at 256.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  The nonmovant must adduce affirmative evidence.  *See Anderson*, 477 U.S. at 257.

In considering a motion for summary judgment, the court cannot make credibility determinations, weigh evidence, or draw inferences for the movant.  *See Anderson*, 477 U.S. at 255. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.*

### IV.   DISCUSSION & ANALYSIS

The Defendants have moved for summary judgment on the following grounds: (1) abstention

under *Burford v. Sun Oil*[6] is warranted; (2) no "imminent and substantial endangerment to health and the environment" necessary to justify an injunction under RCRA exists; (3) none of the Defendants is a person "who has contributed or who is contributing to past or present ... storage ... or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" as required under RCRA; (4) there is no evidence that any petroleum is leaking from the USTs in question; (5) an injunction under RCRA is not a remedy available to K-7; and (6) K-7's claim is barred by laches.  Motion, p. 1-2.

A.    *Burford* Abstention

    The *Burford* abstention doctrine arose out of the Supreme Court case of *Burford v. Sun Oil*.[7] The Court described the doctrine as follows:

> where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*Baran v. Port of Beaumont Navigation Dist. of Jefferson County Tex.*, 57 F.3d 436, 441 (5th Cir. 1995).  *Burford* abstention is concerned with protecting complex state administrative processes from "undue federal interference," but abstention is not mandated simply because the state has an administrative process or because there is a potential for conflict.  *Id.* at 442.

    In general, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817

---

[6]  319 U.S. 315 (1943).

[7]  Id.

(1976).  Therefore, abstention, including under *Burford*, is the exception rather than the rule.  *Wilson*

*v. Valley Elec. Membership Corp.*, 8 F.3d 311, 313 (5th Cir. 1993).  Abstention under *Burford* is

only appropriate in actions seeking equitable rather than legal relief.  "There is no formulaic test for

determining when dismissal under *Burford* is appropriate."  *Sierra Club v. City of San Antonio*, 112

F.3d 789, 797 (5th Cir. 1997).  The Fifth Circuit, however, has examined and applied *Burford*

abstention in several cases and in so doing has found the following five factors to be relevant in

determining whether *Burford* abstention is appropriate: (1) whether the claims arise under federal

or state law; (2) whether the case requires inquiry into unsettled issues of state law; (3) the

importance of the state interest involved; (4) the state's need for a coherent policy in that area; and

(5) the presence of a special state forum for judicial review.  *Id.* at 314 (citations omitted).   In their

motion, the Defendants did not engage in a factor-by-factor analysis, but rather compared the facts

of the instant case to the facts in cases the Defendants found to be factually similar to the instant

case.  K-7 also did not engage in the factor-by-factor analysis and instead distinguished those cases

cited and rebutted the arguments made by the Defendants.  While multiple-factor tests are difficult

to apply because they are largely discretionary, the court must engage in the five-factor analysis to

determine whether *Burford* abstention is appropriate in the instant case.

    1.      Federal or State Basis of Claim

      Under this first factor, the question of whether *Burford* abstention applies does not

necessarily turn solely on whether the claim is based upon state or federal law.  *Williamson v.*

*Guadalupe County Groundwater Conservation Dist.*, 343 F. Supp. 2d 580, 592 (W.D. Tex. 2004).

Rather, the question is "whether the plaintiff's claim is entangled in an area of state law that must

be untangled before the federal case can proceed."  *Id.* at 592.  In the instant case, K-7's claims fall

under RCRA, a federal statute, and K-7 did not make any claims under Texas state law.  The Fifth

Circuit has not addressed whether *Burford* abstention is appropriate when the claim is solely a

RCRA private citizen suit.  Other courts, however, are split on this issue.  *Compare Ada-Cascade*

*Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897 (6th Cir. 1983) (finding abstention

appropriate in RCRA citizen suit) *and  Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1194

(6th Cir. 1995) (same) *with Middlesex County Bd. of Chosen Freeholders v. New Jersey*, 645 F.

Supp. 715 (D.N.J. 1986) (finding abstention inappropriate in RCRA citizen suit).

Here, while K-7's claim is based on RCRA, a federal statute, the EPA has approved the State

of Texas to administer and enforce a UST regulation program.  *See* 40 C.F.R. § 282.93(a).  Not-

withstanding that approval and delegation of enforcement authority, however, the court finds that

the Plaintiff's RCRA claim here is not entangled in an area of state law that must be untangled before

this federal case can proceed.  Moreover, Title 42 U.S.C. section 6972(a) states that any RCRA

citizen suit "<u>shall</u> be brought in the district court for the district in which the alleged violation

occurred or the alleged endangerment may occur."   42 U.S.C. § 6972(a) (emphasis added).

Therefore, federal district courts have exclusive jurisdiction over RCRA citizen suits.  Consequently,

this first factor weighs against abstention.

> ### 2.    Inquiry into Unsettled Issues of State Law

In the Travis County TCEQ case, K-7 filed a declaratory judgment action against the TCEQ

asking that the court declare that the TCEQ failed to design and implement a corrective action plan

for the Property at issue, and that in doing so, the TCEQ "violated 30 TAC §334.81 and is failing

to protect K-7's property from continued environmental contamination."  *See* Def. Mot. Summ. J.,

Ex. P.   In the instant case, however, K-7 has not asked the court to evaluate or interfere with the

TCEQ's actions.  Rather, K-7 is asking this court to order the Defendants to commence and complete all necessary removal and remedial actions to restore the K-7 Property.  *See* Plaint. Org. Pet. ¶ 14. The court, therefore, finds that this factor weighs against abstention.

        3.        <u>Importance of State Interest</u>

A court may determine the importance of a state's interest in a regulatory matter by the regulatory scheme it creates regarding the interest.  *Ada-Cascade Watch Co.*, 720 F.2d at 903.  The mere existence of an administrative structure alone does not mean that *Burford* abstention applies. *Williamson*, 343 F. Supp. 2d at 595.  While *Burford* abstention exists primarily to protect complex state administrative processes from undue federal meddling, abstention is not required whenever such a process exists, or even in every case where there is a potential for conflict with state policy. *Id.*

The court has not found any Texas cases discussing the importance of groundwater preservation with regard to the UST statutes at issue in the instant case, but it has found many cases discussing water conservation.  In those cases, the consensus has been that maintaining and conserving water is a matter of great state concern, as evidenced by the fact that the state has the responsibility under the Texas Constitution to preserve and conserve water resources for all Texans. *Day v. Edwards Aquifer Authority*, 2004 WL 1118721, *2 (Mar. 26, 2004 W.D. Tex.); *Sierra Club*, 112 F.3d at 794.  While those cases concern aquifers and water permits, the court must assume that the UST regulations, which are in place to protect groundwater, constitute an equally important state interest.  This is especially true given the Texas Legislature's findings which include reasons why the state has an important interest in protecting groundwater such as maintaining usable groundwater, protecting the environment and public health and welfare, and protecting the state's economy.  Tex.

Water Code § 26.401.  The court finds that this factor weighs in favor of abstention.

    4.    <u>State's Need for Coherent Policy</u>

As pointed out by the court in *Williamson*, the state has an important interest in ensuring that state law is uniformly and correctly applied.  *See Williamson*, 343 F. Supp. 2d at 595.  The issue in *Williamson*, however, was much different than that with which this court is faced.  In *Williamson*, the allegation was that the state agency had misapplied its lawful authority or failed to take into account relevant state law factors, and the Fifth Circuit abstained because it is important that state law be uniformly applied.  *See Williamson*, 343 F. Supp. 2d at 597.  The Supreme Court commented on this issue in *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI*"), stating that when the original plaintiff did not bring a lawsuit challenging the state scheme or challenging the order entered by a state agency, this factor weighed against *Burford* abstention.  *NOPSI*, 491 U.S. at 363-64.

The issue in the instant case, then, seems to be whether K-7 has brought a claim or raised an issue on which there is a need for coherent policy in the state of Texas.  K-7 has asked this court, in essence, to do what the TCEQ should do: implement a corrective action plan.  K-7 does not ask specifically for the same relief in the instant case, but K-7 does want an order that the Defendants clean up the K-7 Property, something that it appears the Defendants are in the process of doing, as evidenced by the reports and communications between the Defendants, third party vendors, and the TCEQ.  Despite that, no part of the Texas Water Code's statutory scheme or a TCEQ order has been challenged by K-7 in the instant lawsuit.  As such, this factor weighs against *Burford* abstention.

    5.    <u>Presence of a Special State Forum for Judicial Review</u>

When a state needs a coherent regulatory policy, it will often create a special forum in which

an individual may bring claims that fall under the regulatory policy.  *See, e.g., Wilson* 8 F.3d at 316.

A scheme that includes a local agency with jurisdiction over the matter, whose decisions may be

reviewed by state courts, indicates a "strong preference for local decision making."  *See Williamson*,

343 F. Supp. 2d at 597.  Here, however, federal law makes it clear that federal district courts have

exclusive original jurisdiction over RCRA citizen suits.  Therefore, the court finds that this factor

weighs against abstention.

Considering all five factors, the court declines to abstain from exercising jurisdiction over

this RCRA citizen suit.

B.      *Imminent and Substantial Endangerment*

Under 42 U.S.C. section 6972(a)(1)(B), an individual may bring a suit against certain

responsible persons "who ha[ve] contributed or who [are] contributing to the past or present

handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may

present an *imminent and substantial endangerment* to health or the environment."  42 U.S.C. §

6972(a)(1)(B) (emphasis added).  According to the Supreme Court, the "imminent and substantial

endangerment" language plainly indicates a timing restriction.  *Meghrig v. KFC Western, Inc.*, 516

U.S. 479, 485 (1996).  That is, an endangerment may only be imminent if it "threaten[s] to occur

immediately."  *Id.* at 485-86 (quoting Webster's New International Dictionary of English Language

1245 (2d ed. 1934)).  The language "may present" indicates that there must be a threat which is

"present *now*, although the impact of the threat may not be felt until later."  *Id.  See also Cox v. City

of Dallas*, 256 F.3d 281, 299 (5th Cir. 2001).

Defendants offer several reasons why the groundwater contamination does not present an

imminent and substantial endangerment.  They contend that K-7 cannot argue that the contamination

presents an imminent and substantial endangerment because the contamination has likely existed for 30 years, and further, K-7 has known about it for at least nine years.  Other factors that the Defendants claim exist and indicate that the contamination does not present an imminent and substantial endangerment include that the contamination levels at the site have stayed the same or declined since 1998, that the groundwater flow is slow and the contaminants in the groundwater move even slower, and that no one uses the affected groundwater because the City of Denton provides municipal water to the site.  Regardless, the level of contamination at the properties at issue exceeds the recommended allowable contamination levels.  Therefore, viewing the facts in the light most favorable to K-7, the court cannot conclude that the contaminated property, as a matter of law, does not present an imminent and substantial endangerment. Even if the impact of the contamination may not be felt until later, the threat is present *now*.  As such, based on the presence of contaminants in the groundwater which exceeds the recommended allowable limits, the court will deny summary judgment on this ground.

C.  *Person who has Contributed or is Contributing to any Solid Waste Which May Present an Imminent and Substantial Endangerment*

Under 42 U.S.C. section 6972 (a)(1)(B), an individual may bring a suit against only those persons "*who ha[ve] contributed or who [are] contributing to* the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added).  Defendants argue that K-7 has not presented any evidence, or at least not any evidence to create a genuine issue of material fact, that any of the Defendants "contributed" or "are contributing to" any alleged imminent and substantial endangerment.

-15-

Defendants first argue that Defendants Jester and Haywood owned the USTs for a short period of time in 1987, and that K-7 has not produced any proof that Defendants Jester and Haywood contributed to any release that resulted in an imminent and substantial endangerment.  Motion, ¶ C. Defendants next argue that Jeswood only delivered the gasoline to the USTs and therefore could not have contributed to any alleged imminent and substantial endangerment.[8]  *Id.*  As to PJ's, Defendants claim that while PJ's owned the USTs at issue from their installation in 1987 until they were sold to Demab on May 30, 2001, all tank tightness tests have shown the tanks to be tight.  Therefore, Defendants argue, K-7 cannot produce evidence that PJ's contributed to any alleged imminent and substantial endangerment.  *Id.*  Finally, Defendants contend that Demab could not have contributed to any alleged imminent and substantial endangerment because it has only owned PJ's and PJ's Property since June 1, 2001, and even if there had been a release from the tanks since Demab owned the property, the release would not have traveled to the K-7 Property due to the slow average rate of groundwater migration.  In sum, Defendants argue that while K-7 may be able to prove that some leakage has occurred, it is unable to produce any evidence suggesting that the leakage can be attributed to any of the Defendants.[9]

K-7 responds to each of these arguments in turn.  K-7 first contends that Defendants Jester and Haywood did contribute to the alleged imminent and substantial endangerment, as evidenced

---

[8] Defendants also argue that Jeswood is a transporter and therefore exempt from liability under RCRA because there is no evidence Jeswood did not exercise due care in transporting the gasoline.  Despite this claim, as will be discussed, there is evidence that Jeswood was more than a transporter as it is listed as the responsible party with the TCEQ and is the contact company for the groundwater monitoring reports.

[9] Defendants also contend that the contamination might have been there for as long as 30 years, arguing that both the Defendants' experts and K-7's experts agree that the rate of groundwater contamination flow is very slow.  K-7 responds, however, that the Defendants are simply misconstruing the evidence and testimony. According to K-7, a "steady flow" model was used to come up with the *"most conservative"* rate of flow.  As such, it is possible that the groundwater and contamination moved more quickly at times than the most conservative estimate.

by the depositions offered by K-7 showing that when the old USTs were removed and replaced in 1987, there was no evidence of vapors or contamination.  Response, Ex. A, Jester Dep. 36-37; Ex. B, 28, 63.  As to PJ's, K-7 claims that by looking at state records, it is undisputed that PJ's owned the USTs at issue from 1987 until June 1, 2001. Response, Ex. A., Jester Dep. 20; Ex. N.  K-7 next argues that while Jeswood claims it is not the owner of the USTs, it did order that the underground lines and pumps, which connected and supplied gasoline from the tanks to the adjacent property, be removed.  Additionally, on the TCEQ database, Jeswood has been designated as the "Responsible Party" for leaks from PJ's.  Response, Ex. I.  Further, Jeswood is the contact for the Groundwater Monitoring Report, as evidenced by the fact that such reports are sent to Jeswood.  *Id.* at Ex. Q.  Finally, Demab has owned and operated the USTs since June 1, 2001.  A product recovery report indicates that new contamination was found on the K-7 Property in November 2006.  *Id.* at Ex. C.  K-7 argues that this demonstrates that Demab has contributed to the alleged contamination.

Congress did not define "contribute" in RCRA, but the Fifth Circuit has defined "contribute" under the RCRA to mean to "have a part or share in producing an effect."  *Cox*, 256 F.3d at 295.  Thus, the basic question is whether any or all of the Defendants have shared in producing the contamination. The Fifth Circuit has not addressed whether a "strict liability" standard applies under RCRA or whether the plaintiff in a RCRA suit must establish some level of causation between the defendant and the contamination to prevail under the "contributing to" provision of RCRA.  *Id.*  A Northern District of Texas case cited by both parties, however, has discussed the issue and required the plaintiff to establish at least some level of causation between the defendant and the contamination to prevail under RCRA.  *See In re Voluntary Publishing Groups, Inc.*, 2002 WL 31431652, *5-6 (Oct. 22, 2002, N.D. Tex.).

-17-

Viewing the evidence in the light most favorable to K-7, the court finds that the evidence demonstrates the following: (1) when Defendants Jester and Haywood replaced the old USTs, there was no evidence of contamination and thereafter, evidence of contamination existed; (2) PJ's was listed as the owner of the USTs at issue from 1987 till June 1, 2001, during which time some contamination was discovered; (3) Jeswood has been designated as the "Responsible Party" for leaks from PJ's and is the contact entity for groundwater monitoring reports; and (4) Demab has owned and operated the USTs at issue since June 1, 2001, during which time a new contamination was documented in November 2006.  The court finds that these facts create a genuine issue of material fact as to whether each Defendant contributed to any imminent and substantial endangerment.  The summary judgment evidence demonstrates that the leakage occurred at times when each of these parties was exercising some form of control over the USTs or related equipment at issue.  The court cannot conclude as a matter of law that one or more of the Defendants did not contribute to any alleged contamination.  Given the conflicting evidence with regard to ownership, control and groundwater migration, the court denies the motion for summary judgment.

### D.  *Whether the USTs Have Leaked or Are Leaking*

Defendants next contend that there is no evidence that the USTs in question have leaked or are leaking.  The new USTs, which were installed in 1987, are protected by fiberglass, and all lines from USTs to dispensers were replaced to comply with new federal regulations in 1997.  Motion, ¶ D.  The Defendants point the court to several tank tightness tests, which they say confirm that the USTs' lines are tight and without leaks.  Therefore, according to the Defendants, K-7 is unable to produce evidence that the current USTs caused the leak in question.  In response, K-7 points out that PJ's Property was designated as a leaking petroleum tank site in 1998.  Response, Ex. I.

-18-

Additionally, a Texas Natural Resource Conservation Commission (the predecessor to TCEQ) interoffice memorandum stated that from testing completed in the area, it appeared that a subsequent release from the UST system occurred between 12/99 and 3/00. *Id.*, Ex. T.  Viewed in the light most favorable to K-7, this evidence indicates that the new tanks could be the source of the leaks because they were installed in 1987.  As such, the court finds that there is evidence creating a genuine issue of material fact as to whether the USTs in question have leaked or are leaking and summary judgment is therefore denied.

> E.      *Whether an Injunction Under RCRA Is an Available Remedy*

Defendants next argue that the injunctive relief K-7 seeks is not available under RCRA because K-7's request for an order enjoining Defendants' collective contribution to the alleged contamination and endangerment and for removal and remedial action to free the property from all solid waste is not allowed under RCRA.  According to Defendants, RCRA does not allow for injunctive relief forcing a party to "free a property from all solid waste."  Motion*, ¶ E.

Defendants cite to *Meghrig* for the proposition that the principle design of RCRA is not to "effectuate the cleanup of toxic waste sites."  Motion, ¶ E.  The Defendants misconstrue *Meghrig*. The Supreme Court specifically states that there are two remedies under RCRA's citizen suit provision - a private citizen suing under Section 6972(a)(1)(B) may either seek "a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the clean up and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA."[10] *Meghrig*, 516 U.S. at 484.  Therefore, the court does not agree with

---

[10]  The remainder of *Meghrig* focuses upon whether a private citizen may sue for past cleanup costs with the Court concluding that he may not.  *Meghrig*, 516 U.S. at 488.

the Defendants' contentions and cannot find as a matter of law that K-7 is not entitled to the relief it is seeking under RCRA. As such, the motion for summary judgment is denied.

    F.    Laches

Defendants' final argument is that K-7's claim is barred by laches. Defendants contend that K-7 learned of the contamination, no later than February 1998, but did not file the instant lawsuit until 2006, eight years after learning of the contamination. K-7 also sent the Defendants a RCRA notice letter, but did not file the instant lawsuit until three years after sending the notice letter. Additionally, K-7 filed a state lawsuit involving the same property and issues, so it could have brought the two claims - the state law claims and the RCRA claim - in the same lawsuit. Defendants argue there is no excuse for this delay and that it has prejudiced Defendants as they have had to incur the financial and emotional burden of defending against multiple lawsuits. K-7 responds that Defendants are not prejudiced by its delay and that K-7 brought the instant lawsuit in order to initiate a clean-up process which has not occurred, as evidenced by the recent November 2006 contamination discovery.

Under the doctrine of laches, if there has been an inexcusable delay in bringing an otherwise meritorious claim for relief and this delay has unreasonably prejudiced the defendant, the claim must be dismissed. *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 (5th Cir. 1985). In order to sustain a claim for laches, the defendant must show: "(1) a delay in asserting the right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Id.* at 1057-58. Based upon the evidence before the court at this time, the court is unable to conclude that as a matter of law there has been an inexcusable delay by Plaintiff in filing this RCRA action or that the delay has unduly prejudiced the Defendants. The motion for

summary judgment based on the doctrine of laches is denied.

## V.  CONCLUSION

For the reasons stated,  the court concludes that genuine issues of material fact as to the Plaintiff's claims do exist.  Therefore, the court hereby **DENIES** the "Defendants' Motion for Summary Judgment" (de #76).  Further, the court hereby **DENIES** the **"**Defendants' Objections to, and Motion to Strike, Plaintiff's Response to Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran" (de #89) and "Defendants Tom D. Jester, Jr.'s and Paul M. Haywood, Jr.'s Objections to, and Motion to Strike, Plaintiffs' Response Defendants' Motion for Summary Judgment and the Affidavits of Dan Airey and Sullivan Curran" (de #90) except as otherwise discussed in this memorandum opinion and order.

**SIGNED this the 20th day of June, 2007.**

_Richard A. Schell_
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE

-21-